Filed 2/14/24

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TOMMY BONDS III,<br><br>　　　Petitioner,<br><br>　　　v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>　　　Respondent;<br><br>THE PEOPLE,<br><br>　　　Real Party in Interest. | D082187<br><br><br><br>(Super. Ct. No. 37-2023-00007933-CU-WM-CTL & M280282) |

PETITION for writ of mandate from an order of the Superior Court of San Diego County, Howard H. Shore, Judge. Petition granted.

Katherine Braner, Public Defender, and Katie Belisle, Deputy Public Defender for Petitioner.

Mara W. Elliott, City Attorney, Paige E. Folkman, Assistant City Attorney, and Michael E. Cosgrove, Deputy City Attorney, for Real Party in Interest.

Summer Stephan, District Attorney, and Linh Lam, Deputy District Attorney, as Amicus Curiae on behalf of Real Party in Interest.

Concerned about extensive and compelling evidence that criminal prosecutions and sentences in this state are not always race neutral, in 2020 the Legislature enacted the California Racial Justice Act of 2020 (Racial Justice Act) (Stats. 2020, ch. 317 (Assem. Bill No. 2542)). This groundbreaking legislation seeks to reduce or eliminate convictions and sentences that differ based solely on race, ethnicity, or national origin. It does so, in part, by creating a procedure that criminal defendants may use to show that some participant in the process has exhibited bias. Significantly, a defendant can seek relief regardless of whether the discrimination was purposeful or unintentional; in other words, the alleged bias can be implied rather than express. Following an evidentiary hearing, the defendant bears the burden of proving by a preponderance of the evidence that some participant—including a law enforcement officer—"exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." (Pen. Code, § 745, subds. (a)(1) and (c)(2).)

In this case, defendant Tommy Bonds was the subject of a traffic stop by Officer Ryan Cameron of the San Diego Police Department (SDPD). The stop led to Bonds's arrest on a misdemeanor concealed firearm violation. From the outset, Bonds believed he had been stopped because he was Black. During a later hearing to address Bonds's Racial Justice Act claim, Cameron testified that race played no role in his decision to stop Bonds's vehicle because he could not "see what race was in that vehicle." Accepting Cameron's statement as credible, the court ruled it could not find that the officer exhibited any bias because of Bonds's race.

The parties' briefs discuss a host of complex and interesting questions about how the Racial Justice Act will be applied to a variety of arguments and fact patterns. But the scope of our decision is narrow. In denying

2

Bonds's motion, the trial court employed reasoning that ignores a central premise of the Racial Justice Act—that bias can be unconscious and implied as well as conscious and express. By relying on its conclusion that Officer Cameron was not lying when he said he could not discern the race of the occupants in Bonds's vehicle, the court ignored the possibility that the officer's actions were a product of an implicit bias that associated things the officer did know—the location of the stop and the clothing Bonds was wearing—with race. Accordingly, we will issue a writ directing the court to conduct a new hearing at which it considers whether Officer Cameron's actions in initiating and conducting the traffic stop exhibited implied bias on the basis of race.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Traffic Stop*

Officer Cameron was a member of SDPD's Special Operations Unit, formerly referred to as the gang suppression team. In January 2022, along with his partner Officer Eysie, Cameron was part of a "saturation patrol" conducting "proactive enforcement" or "[i]ntelligence led policing." Traveling west on El Cajon Boulevard, he noticed Bonds's vehicle traveling east. After the two cars passed each other, Cameron made a U-turn, got behind Bonds's vehicle and activated his overhead red and blue lights. Bonds pulled into a gas station and stopped.

The interaction between the two was recorded on Cameron's body-worn camera (BWC).[1] After Bonds parked, Cameron approached his car and said, "What's goin' on, bro'? How you doin'?" They exchanged some initial pleasantries, each remarking they remembered that Cameron had stopped

---

[1] Both the video and a transcript of the video are part of the record.

3

Bonds on a prior occasion.  Cameron asked whether "the last time I pulled you over [was] for the license plate [being] covered?"  Bonds acknowledged that it was.  He also told Cameron that the passenger in his car was his "best friend's little brother."

Almost immediately, Bonds inquired whether he had been stopped because he was Black.  The following conversation took place:

> "[Bonds:]  [Y]ou turn around like you saw two guys, like, two black guys in the car obviously.
>
> [Cameron:]  Well, part of it the hoodies up and stuff, just . . . .
>
> [Bonds:]  I mean, it's cold outside.
>
> [Cameron:]  [T]he climate and everything that's goin' on in this city these days, so.
>
> [Bonds:]  Nah, that makes sense.  I wasn't, I'm not try'na pl-, I'm not trippin' at all, I'm just like, um, . . . .
>
> [Cameron:]  Yeah, I know.  I got you.
>
> [Bonds:]  [I]t is cold outside, but.
>
> [Cameron:]  I hear you."

Bonds then asked Cameron directly, "Do you all pull over white people like that?"  Cameron responded with what he later admitted was a lie. He told Bonds, "No I, matter of fact, I get pulled over out in . . . [¶] . . . East

County," which he said was because of his extensive tattoos.[2] "They stop me all the time . . . [¶] . . . 'cause I'm wearin' a snap hat backwards."[3]

At that point, Cameron asked Bonds if there were "guns or anything like that in the car?" Bonds admitted there was a legally registered unloaded firearm in the back of the vehicle. He was handcuffed, arrested, and ultimately charged with a misdemeanor violation of Penal Code section 25400, subd. (a)(1).[4]

B.    *The Racial Justice Act Motion*

Bonds filed a motion for relief under the Racial Justice Act, specifically section 745. The motion relied on independent studies and statistical evidence purporting to show significant racial disparities in local policing, particularly with regard to the nature and frequency of traffic stops. The court indicated it was "not really considering the studies or conclusions of the experts" and "prefer[red] to rely on the specific facts of the case." Finding that Bonds had made a prima facie showing of racial discrimination under subdivision (c) of section 745 by offering facts it was required to *assume* were true (see *Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 23 (*Finley*)), the court set the matter for an evidentiary hearing. But the judge cautioned the

---

[2]    Cameron, who is White, later testified, "I've never been stopped in East County. I've never been stopped in the county of San Diego." He attempted to explain his admitted dishonesty: "It's a form of de[-]escalation that I use. . . . I've developed it over my career as a way to de[-]escalate away from that situation because race has no relevance, has no bearing on a traffic stop."

[3]    We assume Cameron was referring to a "snapback" hat with an adjustable closure.

[4]    All statutory references are to the Penal Code unless otherwise indicated.

parties that setting the hearing "is not an indication that I believe there's been a violation by a preponderance of the evidence."

At the hearing, Bonds offered testimony from three experts. Dr. Joshua Chanin, a quantitative statistical researcher and associate professor of public affairs at San Diego State University, discussed four independent research studies about racial bias in the SDPD as well as his own research on the topic. Beth Mohr, a retired SDPD officer and police policy expert, reviewed the BWC footage depicting the traffic stop and testified to her conclusion that Officer Cameron's conduct during the traffic stop was consistent with racial bias.[5]

Finally, Dr. Karen Glover, a sociologist specializing in race studies related to law enforcement and professor at California State University, San Marcos, also reviewed the BWC video. She testified about the difference between explicit and implicit bias, explaining why Officer Cameron's statements and conduct during the traffic stop were consistent with racial profiling. In particular, she commented on how Cameron responded to Bonds's statement—"you turn around like you saw . . . two black guys in the car obviously"—by suggesting that race wasn't the motivation for the stop. Rather, it was "the hoodies up and stuff." In Glover's opinion, Cameron's response was an example of racial profiling and the use of "coded language": "The officer is not having to map out or describe what a hoodie means. There's an assumption that the hoodie means something about criminality when it's connected to . . . people of color."

---

[5] Perhaps reflecting its misunderstanding that intent was a necessary element, the court previously ruled it would not permit a witness to testify as to someone else's state of mind, but would only allow opinion testimony that certain conduct was "consistent with" racial bias.

In addition to the three experts, Bonds also called Officer Cameron to testify. Cameron claimed the traffic stop could not have been the product of racial bias "because I cannot see what race was in that vehicle." He recalled that the basis for the traffic stop was a rear license plate cover violation. But he remembered, apparently incorrectly, that the prior stop he and Bonds discussed was for a tinted windows violation.[6] Cameron never explained how he noticed a rear license plate violation as he approached Bonds's car from the front or what caused him to make a U-turn and activate his overhead lights.

The trial court denied Bonds's motion in a six-page statement of decision, which perceived there was a question whether section 745 was intended to apply to a law enforcement officer's conduct "before prosecutorial involvement" but was willing to assume that it did.[7] The court admitted into evidence "all of [Bonds's] proffered studies and articles without an extensive foundational hearing for each," but indicated "it would simply weigh the evidence and give each study whatever weight it deserved." It went on to conclude, however, that aggregate statistics about a police *department* were entitled to little weight because "there is no way for a court to draw . . .

---

[6] Cameron testified, "We discussed it, 'cause he mentioned the last interaction we had, and that was for tinted windows, I believe." In contrast, the transcript of the BWC video reflects that Cameron asked Bonds, "I forget, was the last time I pulled you over for the license plate [being] covered?" and Bonds answered, "Um, yes."

[7] Since the trial court decision in this case, it now seems clear that a motion under the Racial Justice Act is properly brought to address alleged racial bias during a traffic stop. (See *Finley, supra,* 95 Cal.App.5th 12; see also Couzens, *California Racial Justice Act of 2020* (Nov. 2023) at p. 8 ["The prohibition [in section 745, subdivision (a)(1)] is sufficiently broad to . . . include bias or animus exhibited during a police investigation."].)

conclusions [about an officer's state of mind] from general statistics without speculating whether a particular officer's conduct on a specific occasion falls within those statistics and any conclusions based on such statistics."

In the end, the issue for the trial court was a simple one. Was Officer Cameron telling the truth when he said he did not know and could not see that the occupants of Bonds's vehicle were Black? Noting that Cameron's interaction with Bonds "was courteous and respectful," the court found "nothing in the record that would support a conclusion that Officer Cameron committed perjury when he testified at the hearing." In the court's view, this finding mandated that the motion be denied. The court's decision never mentions implied or implicit bias.

Bonds's writ petition to the superior court's appellate division was denied in a three-sentence order that found the trial court's determination "supported by substantial evidence." Bonds then filed a writ petition in this court, seeking review of the appellate division decision. (Code Civ. Proc., § 904.3.) We issued an order to show cause.

## DISCUSSION

### A

The Racial Justice Act is new legislation, having become effective only three years ago. Appellate decisions interpreting it are, as yet, few. It is also novel in concept and expansive in scope. The express purpose of the Racial Justice Act is "to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is intolerable [and] inimical to a fair criminal justice system . . . ." (Stats. 2020, ch. 317, § 2, subd. (i) [uncodified].)

8

The trial court in this case expressed concern that in enacting the Racial Justice Act, "the Legislature . . . has not thought through some of these issues sufficiently to provide proper guidance to attorneys and judges." That may or may not be true. Surely the implementation of legislative policy often involves a back-and-forth process of enactment, interpretation, and amendment to clarify and fine-tune a statutory scheme.

Whatever may be uncertain about the Racial Justice Act, there are a few things that are abundantly clear. Perhaps most obvious is that the Racial Justice Act was enacted to address much more than purposeful discrimination based on race. Indeed, the primary motivation for the legislation was the failure of the judicial system to afford meaningful relief to victims of unintentional but *implicit* bias. In an uncodified section of Assembly Bill No. 2542, the Legislature explained, "Implicit bias, *although often unintentional and unconscious*, may inject racism and unfairness into proceedings similar to intentional bias. The intent of the Legislature is not to punish this type of bias, but rather to remedy the harm to the defendant's case and to the integrity of the judicial system." (Stats. 2020, ch. 317, § 2, subd. (i) [uncodified], italics added.)

According to the author of the bill, the Racial Justice Act "is a countermeasure to a widely condemned 1987 legal precedent established in the [United States Supreme Court] case of *McCleskey v. Kemp*[, which] established an unreasonably high standard for victims of racism in the criminal legal system that is almost impossible to meet without direct proof that the racially discriminatory behavior was conscious, deliberate and targeted." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 2542 (2019–2020 Reg. Sess.) as amended Aug. 1, 2020, p. 7, italics added.) This overriding purpose is emphasized in subdivision (c)(2) of section 745, which

9

defines the defendant's burden of proof on a motion to demonstrate a violation of the Racial Justice Act. It expressly provides that "*[t]he defendant does not need to prove intentional discrimination.*" (*Ibid.*, italics added.)

The trial court seems to have misunderstood this crucial element of the statute. To be sure, section 745 can be used to address a claim of purposeful discrimination. But plainly that is not a statutory requirement, nor is it even the primary object of the statute. By focusing on whether Officer Cameron credibly testified that he did not know the occupants of Bonds's car were Black when he initiated the traffic stop—or in its words, whether Cameron "committed perjury"—the court applied the wrong legal standard to the motion.[8] Cameron's claim of ignorance, if believed, might indicate that he did not *intend* to discriminate on the basis of race. But implicit bias is, by definition, *un*intentional and *un*conscious. The court's findings on the record, required by the statute (§ 745, subd. (c)(3)), fail to address the abundant evidence suggesting that the traffic stop may have been the product of unintended racial bias.

The People's brief concedes the foundational legal point when it agrees, "[A]n officer could exhibit implicit or explicit bias towards a defendant and a trial court could find a violation of Penal Code section 745." But they suggest that law enforcement officers cannot exhibit any kind of bias "because of" a defendant's race (§ 745, subd. (a)(1)) unless they are aware of that race. This argument misapprehends the scope of implicit bias.

As the testimony in this case illustrates, implicit bias can appear at multiple levels. Certainly, an officer (or other participant in the criminal

___

8    Of course, we defer to findings of fact by the trial court that are supported by substantial evidence, but review de novo the court's legal rulings and its interpretation of the statute. (See generally *Young v. Superior Court* (2022) 79 Cal.App.5th 138, 156.)

justice process), observing that a defendant is Black, could "unintentionally" treat them differently.[9]  But implicit bias can manifest itself in other ways based on unstated or even unconscious assumptions.  Dr. Glover explained that terms like " 'proactive enforcement' " typically refer to identifying a "high crime" area in the community and imply "making a stop on a relatively low level violation, with the . . . anticipation that there might be a larger criminality involved."  If that portion of the community is disproportionately populated by persons of a particular race, a detention could be the product of implicit bias even if the officer initiating the stop did not "know" the race of person being detained.

Even on the individual level, conclusive knowledge about the race of the subject is not necessary to show implicit bias.  Here, although he claimed he could not tell that Bonds and his companion were Black, Officer Cameron was able to discern that each was wearing a "hoodie" with the hood pulled up.  Cameron found this suspicious and it prompted his decision to make a U-turn, follow Bonds's vehicle, and ultimately conduct a traffic stop.[10]  As Dr. Glover explained, "A hoodie is a piece of clothing" that has been

---

[9]  Bonds argues that, even accepting Officer Cameron's testimony he could not discern the race of the occupants of the vehicle, there was substantial evidence supported by expert testimony that Cameron exhibited racial bias throughout his interaction with Bonds *after* he realized Bonds was Black.  The People respond that relief under the Racial Justice Act is limited to instances of racial bias that results in a conviction or longer sentence.  We find it unnecessary to reach this issue.

[10]  Police policy expert Mohr also testified about the hoodie as the basis for the traffic stop:  "Well, wearing a hoodie in a car isn't illegal.  So for that to be apart [*sic*] of the reason for the stop, again, unless they were seeking a particular individual from, say, a bank robbery from a few minutes prior who was wearing that color hoodie or something, . . . just wearing a hoodie isn't a valid reason to conduct a traffic stop."

"criminalized" because it "invoke[s] some thoughts of a threat . . . depending on who's wearing it." "The officer is not having to map out or describe what a hoodie means. There's an assumption that the hoodie means something about criminality when it's connected to . . . people of color." Thus, it was not necessary that Cameron had verified the occupants were Black before he stopped their vehicle, because he may well have subconsciously assumed they were based on their clothing, their presence in the neighborhood, or other subtle factors.[11]

In short, the court applied an incorrect legal standard in concluding that Officer Cameron could not exhibit racial bias unless he "knew" the race of the vehicle's occupants before initiating the traffic stop.

B

We briefly comment on an additional issue that will likely arise at the new hearing on Bonds's motion. The People argue the trial court properly disregarded the statistical studies offered by Bonds. They assert that "[g]eneral statistics about the prosecuting agency are appropriate when the alleged violation concerns the charged crime or penalty sought. The same is not true when looking at an individual police officer, or an individual attorney or individual judge or individual expert." They claim that Bonds "should have obtained statistics concerning the stops this officer made." An amicus curiae brief submitted by the San Diego County District Attorney takes the argument a step further, suggesting that statistical evidence

---

[11]    Similarly, an officer conducting a traffic stop on a "lowrider" vehicle might not need to see the occupants to assume they were Latino. (See Lowriders, Cars With Identities, National Museum of African American History and Culture (2024) <https://nmaahc.si.edu/explore/stories/lowriders> [as of Feb. 14, 2024], archived at <https://perma.cc/93HB-R9TV>.)

regarding SDPD practices is inadmissible character evidence under Evidence Code section 1101, subdivision (a).

The problem with both variations of the argument is that in section 745, subdivision (c)(1), the Legislature has specifically provided that "reliable, statistical evidence, and aggregated data are admissible for the limited purpose of determining whether a violation of subdivision (a) has occurred." The provision makes no distinction between the various subparts of subdivision (a), so there is no basis to say that such evidence is only admissible to prove certain types of violations but not others. This is not to say that in this case, aggregate data about SDPD practices in making traffic stops would be sufficient by itself to show that Officer Cameron's stop of Bonds was the product of racial bias. But by the express terms of the statute, this is admissible evidence the trial court is entitled to consider in determining whether a violation of the Racial Justice Act has occurred.

DISPOSITION

A peremptory writ of mandate shall issue directing the superior court to vacate its order denying Bonds's motion for relief under the Racial Justice Act and to conduct a new hearing consistent with the views expressed in this opinion.


DATO, J.

WE CONCUR:


IRION, Acting P. J.


KELETY, J.

13